We will now call our last case of the day. Contrero Castro versus Attorney General, number 19-3733. And we'll hear from you to start, Ms. Cambria. Thank you, Judge Krauss. May it please the court. My name is Bridget Cambria. I am counsel with Aldeba, the People's Justice Center, and I'm here on behalf of the petitioner, Mr. Christian Contrero. I'd like to reserve two minutes for rebuttal, please. Granted. Thank you, Your Honor. Mr. Christian Contrero is a 22-year-old LGBTI identifying man from Honduras. Tomorrow will mark his 20th month in immigration detention, where he continues to fear persecution and torture should he be returned to Honduras. We see three main issues in this case. One, we see an ambiguous holding with regard to nexus to the persecution that Christian faced. Two, we believe that the unwilling or unable application in this case, one, was based not on substantial evidence in the record, and two, an improper standard was applied to the applicant. And three, we believe that the CAD analysis conducted by the immigration judge below was improper, that did not follow this court's precedent and requires a remand. Just start with the nexus for me. Yes, Your Honor. Are you asking us to find in your favor across the board on this nexus issue, or to remand for further consideration on the nexus issue? I think this court can do either, and let me explain why. I believe that the court below, the decisions of the immigration judge were ambiguous. On one account, she finds that nexus was related to general crime or a general intent to commit a sexual offense, which was the rape of the respondent. I mean, sorry, the rape of the petitioner in this instance. But at the same time, she also found in her decision that he was harmed on account of his sexual identity, and he was harmed because he chose to vote for a particular party that his persecutors did not like. So I believe that it could go either way. I do believe that the fact that it's ambiguous, it could be remanded to the immigration judge in the first instance to clarify. And I believe that that was the government's invitation in their brief. They do note in a footnote that should the court question the nexus, that the matter should be remanded back to the immigration judge. Cambria, the government, you know, your brief, you're focusing very heavily on nexus. The government is not defending nexus. But you also have to win on government involvement or acquiescence. You didn't file a reply brief here. So what's your response? You didn't respond. I do appreciate that, Judge Bibas. And also, I did welcome the letter from the court, which sort of hinged on the unwilling or unable aspect. We did present in our brief that we did not believe that the determination of the immigration judge that the Honduran government was able or willing to assist the petitioner in this case was not supported by substantial evidence. And I believe that it hinges exactly on the question that the court posed in their letter. On one hand, we have an unwilling or unable standard in this circuit. And there are voluminous cases that have applied the unwilling or unable standard in this circuit. And then on balance, we have an intervening decision in matter of AB, which was issued by the Attorney General in a precedential decision, which purports to heighten that standard. Although using the words unwilling or unable, it defines that standard using a heightened standard, using the words condoned or completely helpless. Okay, completely helpless is not an issue here. It wasn't mentioned in the decision below. Now, when I look at the dictionaries for condone, the classic meaning of condone is to overlook a particular fault. I don't see how that raises any burden beyond the, you know, acquiescence or unwilling. You want to read condone as affirmatively endorsed. I think your letter brief talked about affirmative support. But that's a kind of a slangy use of condone, or at least very colloquial use of condone to mean approve. Why should we read it as inconsistent with the word unwilling that was used right before and right after it in the opinion? Well, thank you, Judge Bevis. I believe that this case is a good example as to why that's problematic. We have a voluminous history of unwilling or unable precedential decisions in this circuit. And the lower court in this case didn't rely on any of them. In fact, it only relied on AB. And AB contains extremely problematic language with this circuit. And you could, as a state actor, not condone a behavior, but still be unwilling to assist a person to respond to that non-state actor. Is it unwilling or unable results oriented? If you're looking at condone, it sort of follows the unwilling language. And if you look at cases in this circuit, you're going to find cases that would have, should you apply a condone standard, would have turned out differently. OK. That's assuming that condoned has that slangier colloquial meaning. If condoned means overlook a particular fault, how does it mean anything different from acquiescence or unwilling? Well, if we look at it in this case, the IJ purported to find that the Honduran government was not unwilling because rape is illegal in Honduras. Because the type of harm that the petitioner suffered in this case is not lawful. And that there are, for example, police or there are other agencies that purportedly could have assisted the petitioner in this case, but did not. Your client hasn't raised, before we sent out the request for subpoena briefing, your client didn't raise the AB challenges to condoned at all, correct? I can't find that before. You are correct, Judge Bevis. And the reason is, is that the standard is unwilling or unable. And my concern for this court and for my fellow attorneys who will follow after me is that AB is problematic because just like the government, for example, relies only on AB in their brief to define the unwilling or unable standard. And that's the pitfall that judges are falling into. That's what the immigration judge at the lower court fell into in this case. They're relying solely on that case because it is a precedential decision that's issued by the Attorney General. Immigration judges are agency judges. They are compelled to follow what the Attorney General tells them to do. The issue, the problem with this case is that the strong language and the heightened standard does not follow the precedent in the Third Circuit. But if you didn't raise it, if you didn't raise it before, why should we take this case as the opportunity to correct it if it hasn't been? If, Your Honors, if you choose this case to correct the standard, I would be grateful. In any event, it has to be done. Because what's going to happen is, for example, in this case, we're dealing with withholding of removal and we're dealing with cat. These are mandatory protections. The consequence of not correcting the standard, of not ensuring immigration judges apply the right standard, of not ensuring that the precedent of this court continues, is that people will suffer persecution or torture. So the consequence is so great that if we need to correct the standard in order to protect Christian, we should. If we're not able to determine from these opinions whether using that terminology, the standard, would we need to then remand? Judge Cross, I believe that that's correct. I believe that the judge in this case and her decision uses the words unwilling or unable. And then following that determination, uses the word condone and uses different holdings solely for a matter of AB to restrict and deny the case on the fact that the saying that the Honduran government was willing and able to protect him. So at a minimum, the case should be remanded to her to clarify and to follow this court's precedent. That's only if we conclude that condone and completely helpless are, in fact, different than unwilling and unable, right? That's correct, Your Honor. And I just want to stress that it is self-evident that the words condone or completely helpless are not the same words as unwilling or unable. And my concerns, as I said before, is that should we use that heightened standard? And I'm calling it heightened because that's what I believe it is. You're going to have cases that were decided as recently as this year from this court that are not going to turn on the same outcome. I mean, to give an example, Mendoza-Oreana, which was a case where the petitioner was determined to have a particular social group of being an informant against the MS-13 and had cooperated with law enforcement in testimony. In that instance, the government did not condone the behavior because they were actively trying to go after his persecutors. But at the same time, the Honduran government was not able to protect him. And for that reason, he could succeed on his claim. It is completely helpless at issue here, though. I didn't see the ruling as turning on that. I thought only the condoned part was the complaint here. Yes, Judge Meeves, the only language, aside from using the actual holdings from AB, she did not use the words. The immigration judge did not use the words completely helpless in her rationale, but she did use the word condone. And she did use actual holdings, literally sentences derived from AB, in her determination that the Honduran government was willing or able to protect the petitioner. Could I ask you about relocation? Mr. Canero-Castro didn't have any run-ins with the gang in San Pedro. It's two and a half hours, two hours from where he is. Can't he safely relocate there? Why is that not an independent bar? Your Honor, relocation in this instance is certainly not a bar. And the determination of whether relocation restricts protection is not whether he could, it's whether it's reasonable for him to do so. So as an LGBTI person, as a person who his entire life has been harmed or humiliated or intimidated because he is perceived as homosexual, he has a lifetime worth of evidence to show that that is not reasonable. He doesn't allege, in the couple of months he was in San Pedro, he alleges no threats or harassment that he suffered based on the protected characteristics, based on bisexuality or political opinion while he was in San Pedro. I, if there's anything in the record on that, I want to know because I couldn't find it. Yes, Your Honor, the parts of the record that I would point you to is, one, he did testify that he, while in San Pedro Sula, suffered discrimination, especially in the form of being unable to find employment. That is actually supported by the Department of State Human Rights Reports, which also state that LGBTI persons are discriminated in their employment. He also testified that despite being able to participate in a gay march, for example, that persons who participated in those gay marches, that he was aware of persons being killed. He suffered no threats. He suffered no harassment. That's correct, Your Honor, but you are talking about a very short period of time, and you're also talking to the country that is not large. Like I said, the factors for relocation, and I don't have the statute in front of me, but there are specific things you have to consider. You have to consider the totality of harm throughout the country. You have to consider employment issues. You have to consider the fact that he is a member of a vulnerable population. Those are all factors that have to be considered. Why do we have to consider employment issues? The regs talk about economic infrastructure. You can't expect someone to go to the middle of the Amazon rainforest or something, but why do we have to consider employment more specifically than that? I was just giving you an example that is in the record of something that he expressed, but we also have to look at the conditions within the country themselves. Honduras is not a big country. San Pedro Sula is one of the most violent cities on earth. It has one of the highest murder rates on earth. The gangs, he also testified that in San Pedro Sula, it's not just the Mara 18 who he feared in his hometown, but in San Pedro Sula, there are two gangs present, the MS-13 and the Mara 18. The fact that he was persecuted throughout his life based on his sexual orientation, where he lived, and the fact that he moved to San Pedro Sula, he would still be considered or still would be an out member of the LGBTI community. Even in San Pedro Sula, the Department of State reports still cover the fact that violence is not the country. There are no pockets of safety for gay persons within Honduras. That's just not supported by the record. If there are no- If I understand correctly then, as to relocation, your argument is both that it was an erroneous finding, and but also as to process in that there's no indication that the court considered the particular factors under the regulation as to efficacy and reasonableness? That's correct, Judge Krause. And specifically in this case, the judge had an obligation to consider both the good and the bad factors for the petitioner. She didn't. She didn't make that analysis. She focused on the factors that were more favorable to the government, and didn't at least consider the factors that are required under the regulation, and also the factors that were most beneficial to the petitioner, and at least tell us why those weren't important. Ms. Kimberg, could I ask you about withholding versus CAT? The reasonable fear interview didn't address CAT. The boxes that are checked say, well, maybe there's a reasonable fear but not a- a prosecution, but not a reasonable fear of torture. That was not checked on the form. And then at his previous attorney, not you, said at the May 16th hearing that the application should be withholding even after the IJ suggested there was a CAT claim. That's an administrative record at 80. Your brief was almost entirely about withholding. You've had one page on CAT. So is there a CAT claim before us, or is this really a withholding case? Judge Bibas, this is both a withholding and a CAT claim. And I can explain those instances that you're talking about in the record. Just on practice, if you participate in a reasonable fear interview, the determination by the asylum officer, if they find that you have a reasonable fear of persecution, they don't reach the torture question. So they won't actually complete that part of the form. But that doesn't mean that he does not have a claim under the CAT. Additionally, as far as the record itself, although the- my counsel before me mentions that this should be a withholding claim, it still requests protection under the CAT in his application. So I don't believe that that's waived. Additionally, in our briefing, we also raised the issue of CAT. And the reason that the CAT is so important in this case is that the underlying immigration judge's decision is really barren as to the findings, the factual findings that she relied on to reach the legal questions. And this is what is problematic throughout our recent precedent here in this court regarding CAT analysis. You can look at Kaplan, you can look at Myrie, and you can look at as clearly as Quinteros. The questions that an immigration judge has to ask or has to answer in their opinion so that we can reach our obligations under the CAT regulations. Um, so I believe that she jumped to fact to legal findings but did not tell us on what factual grounds she relied. And I believe that that is a fatal error under Quinteros and Myrie. And again, for that reason, it needs to be remanded back to her for findings in the first instance. Thank you, counsel. We'll come back to you on rebuttal as we have exceeded time. Ms. Green. May it please the court. I hope I unmuted successfully. May it please the court. I'm Susan Green. I represent the attorney general. Your honors, this is a case where Mr. Canarrero suffered past harm and threats from private criminals in Honduras and no government official was involved in it or even aware of it. And the IJ's decision hinged on her finding that Mr. Canarrero didn't prove a more than 50% chance of future persecution or torture on this record as a whole. And that's supported by substantial evidence. But this court has asked a couple of questions. We need to be sure that the IJ was asking the right questions to reach that conclusion. And you point to private individuals. To the extent you're referring there to the individual perpetrators in the rape, where is there in the IJ's analysis, any discussion of the gang threats as they relate to sexual orientation? Well, I mean, the IJ primarily, I think, discussed the gang threats in the context that Mr. Canarrero discussed them. Mr. Canarrero said that the gang threats were about his vote. He said it all started in November of 2017 after he voted. So his testimony about the gang was primarily focused on their hassling him about his vote. And then sort of, they also said something like, also, we don't like gays or something. But the main gist of his testimony about the gang  that they opposed. So didn't he raise the issue about their comments to him in connection with threats as to sexual orientation at each of the interactions, each of the times that gang members had approached him? At least twice, he said that they said something about it. But he said that the reason that they searched him out was it was about this voting issue. And so, generally, the threat from the gang was precipitated by the voting issue. What about the police comments about him being gay and ridiculing him for being gay? No, no, no, no. He said that he was afraid that the police would say that. But when he actually went to the police and complained to them that he had been raped, he did not report that the police ridiculed him. He said that the police did say that it was a problem that he had waited for six months and didn't think that there was much that they could do. But he absolutely did not report that the police were abusive to him. And he did report one instance, he said that he was with a group of people. And from a distance, he said, police pointed a weapon in their direction, but then when he was questioned about that, he said, well, it was from a distance. He was with a group of people. He did not portray that as being some kind of immediate and menacing threat. But as it goes to the government's awareness and either unwillingness or inability to intervene where there is persecution based on a particular characteristic, don't we have in this record, both his testimony as to the police pointing a gun and joking about sexual orientation, even at a distance. And secondly, the gang telling him that they in effect had control of the police or the police would not be intervening. Your Honor, I mean, that is something that, that's the part of a gang threat for them to say that the police are with them. That, I mean, I think generally that is often said, but it's not considered to be probative of what the police are actually gonna do. That's part of the gang trying to coerce people. The immigration judge did look at the country conditions evidence, particularly the State Department evidence that said that the country had prioritized violence against LGBT persons as something that the country was trying to address. They had amended their penal code to make hate crimes against LGBT persons, that they had a special violent crime task force that was focusing on LGBT persons. So there was, what there was in the evidence was mixed evidence, which is often the case. And importantly, Mr. Canerero did not argue like in his CAT argument, he didn't argue that the immigration judge overlooked any evidence. He simply argued that the immigration judge's findings were contrary to the weight of the evidence. And the weight of the evidence, of course, on substantial evidence review is that, you know, the court doesn't reweigh the evidence either. So is it your position that the IJ adequately considered all the country conditions submitted? Yes, Your Honor, the IJ did refer to the country conditions evidence. That's like, I think pages 52 and 53 of the record and did discuss that there was mixed evidence. And yes, the IJ did consider the mixed evidence. And pointedly, Mr. Canerero did not argue that there was anything that was overlooked in his brief. What do you make of the IJ's statement that general country condition evidence is generally insufficient to establish, make the showing? Okay, and what that was about, that's in the CAT portion. And generally, the point there is that if there is evidence of violence in a country, there's lots and lots of cases that say evidence of violence in a country doesn't show that any person in that country has a more than 50% chance of being tortured with government involvement. And that you need to have generally, and unless the country conditions evidence was that extreme, you need to have something that shows that you are at risk. Like in the Quintero's case, he had evidence that he had a tattoo that police were going to discover and that was gonna put him at specific risk. In this case, there is certainly, there is no country conditions evidence that suggests that anybody in Honduras has a 50% chance of torture with government acquiescence. And there's also not evidence that any LGBTI person in the country has that chances at all. It's a country of 9 million persons and there's certainly nothing that suggests that more than 50% of LGBTI people are being persecuted or tortured with police being unwilling or unable to help them. Ms. Green. Yes. So you mentioned Quintero's, but Quintero's applied the Dutton-Meyrie factors and sub factors and those were not specifically answered here. So do we need a remand to deal with those? Your Honor, yes, the Meyrie factors certainly the court has counseled the agency to look at that. And I wanna point out that the attorney general this year has cited the Meyrie test and has instructed the agency to comply for the board to differentiate between the matters of fact and law and to make sure that they're applying the correct standard of review. But in this case, you're correct that the immigration judge did not cite those factors. And so of course the court could remand for that reason, but I think there's a really good reason why the court should not and why we went ahead and briefed that as we did. And that is that, as the Supreme Court is want to say, there's no point to remand for a better explanation if the agency's path may reasonably be discerned. And I think in this case, you can discern that immigration judge's reasoning. The immigration judge did hew to the regulations and what the immigration judge did make that finding that he could relocate. The first Meyrie question is what is gonna happen if they return? And the immigration judge found he could relocate to San Pedro Sula. He had done so. And that- But don't we need to decide the burden as to who must prove or disprove relocation changes depending on whether the elements of past persecution have been satisfied, right? Your Honor, I'm sorry. We're talking about the CIT statute and it does not have that burden shifting mechanism in the CIT statute. So you're talking about the withholding regulation. And so- Maybe we can circle back to that, but to the extent you're suggesting that relocation can simply be answered is the absolute answer to both claims. It does make a difference when it comes to the persecution showing for the withholding, right? And I would say, Your Honor, that the immigration judge didn't go into relocation on the withholding. And indeed, Mr. Canteraro didn't raise that as an issue. So the relocation finding in this case was in the CAOT context and it doesn't have that burden shifting. And I'd also say that counsel petitioner was arguing that all the relocation factors from the withholding statute are supposed to be required in the CIT statute or regulation for relocation. Well, the CIT regulation doesn't have all that. So that's, you know, I would not apply the regulations from withholding in the CIT context. But so going back to the Miri questions, I mean, the first question that Miri asked is what's gonna happen. And when the immigration judge answered that question in her analysis on CIT, that he would be able to relocate to San Pedro Sula, he had done so, he had not been harassed. That really answers that first Miri question. And the way that Miri has set up is if the answer to the first question is, well, what's gonna happen in the future? It looks like the person's not gonna be harmed. Then those other Miri questions are really moot. I mean, you don't go further and say, well, if the person's not gonna be harmed, does that amount to torture? I mean, all the other Miri questions are predicated on the idea that the answer to the first question is that the person is likely to be harmed. So for that reason, I think that the Miri analysis, it's not actually necessary to remand on that. And I would like to talk really briefly, if I could, about this, the question about the AB, because I think that that's important. I mean, the court asked whether you all should be looking at the AB issue in this case. And I would say the very first thing is, no, you shouldn't be looking at the AB issue in this case because Mr. Cantarero did not raise it either to the agency or in his opening brief here. And there is a case that's exactly on point for this. And that is this court's DOE decision from earlier this year. And in that case, it was just the same thing. It was about AB, but the shoe was on the other foot. The government had failed to raise it in its opening brief. And then the government sent a 28J letter and the court said, well, no, you did not raise AB in your opening brief. And so it's waived. And so I think the same answer should apply here is that Mr. Cantarero didn't waive, neither exhausted nor preserved AB in this court. But there's another reason. So if hypothetically we were to remand, are you suggesting that we should not articulate what the standard is within our circuit as to unable and unwilling? And I, well, I don't think that you should remand on this question because I think that it was not exhausted and it was waived. But if the court, and the second thing is, and I think Judge Bibas alluded to this, it also wasn't part of the immigration judge's decision in this case because the immigration judge did use the word condoned, which this court has used and which has been in use by the board since 1964, but didn't raise this, didn't use the helpless language. So I don't think that there's any reason for the court to remand on this issue. Let me clarify, if this court hypothetically were to remand as to findings on other issues, is it your position that the court should refrain from articulating what the proper standard is as to unable and unwilling to, in terms of guidance on remand for the agency to address the record when it came to issues like persecution or nexus? So if you're asking me if you should consider whether AB modified the standard, I mean, I guess you're asking whether you should address that in this decision, and I don't think you should for the reasons that I've said. If the court, if you were to reach that, even though I don't think that it was not exhausted, it wasn't raised, and it also isn't necessary to address it on the IJ's decision, that you still think that you need to reach that anyway, then I think that the court should not get into a circuit split sort of gratuitously. But if you were going to address that question anyway, I think you should definitely say with the other three circuits that have considered this question that AB did not change the standard. AB used a standard that has been in use regularly by the courts of appeals since the year 2000, by three circuit points. I thought the second and fifth circuit took that position, but the DC circuit, and in a footnote, the sixth circuit rejected AB. Okay, okay. The fifth and the second circuit said that AB did not change the standard. The ninth circuit in an unpublished case also said, that's DiGiulosi, and we cited that, also said that it didn't change the standard. The sixth circuit, it was dictum because they were looking at a pre-AB decision. So the sixth circuit, I think, doesn't count. The greatest decision in the DC circuit was in the, yes, they did say that the standard had changed, but with very little analysis, they basically just said, it's obvious that condone and helpless are different words. They didn't look at the long history of the use of those words in the circuit courts of appeals. They did not look at the fact that other circuits that apply immigration law regularly had said it did not change the standard. So yes, there is a circuit split with the weight of authority saying that AB did not change the standard. So you did not dispute nexus, but government is not conceding nexus either, correct? Your Honor, we did not defend the nexus holding because we did not think it was adequate. We thought that there needed to be a mixed motive analysis. And we also thought that there was not even enough analysis about the two rape incidents. There wasn't any analysis as to whether those even met the basic motive requirement of whether the perpetrators knew of the protected characteristic and were motivated by it. So we thought that the court was gonna conclude that there wasn't enough reasoning there. And that's why we did not defend that ground. How about on political opinion? Is it the government's position that if someone has not previously voted, but on one occasion expresses a political opinion and is then persecuted for it, that that is an insufficient nexus? Your Honor, no, we did not defend the nexus holding. And I mean, we don't think that there's enough reasoning there. And yeah, the political opinion was part of nexus that we decided not to defend. That's right. Thank you. I have so much stuff that I've covered up my time clock to see if I'm out of time. If I have time, I would like to address one more point about the Quinteros argument. When this court asked whether this case was consistent with Quinteros, you know, that was a really broad question because Quinteros has a lot going on. And one thing that the petitioner raised in their supplemental brief that we had not addressed, and then I wound up addressing in a 28-J letter, is this question about this language in Quinteros about whether the government is supposed to focus on, I mean, whether the agency is supposed to focus on the results or the effort to contain, to prevent the harm. And I don't know if the court, if that's what the court was thinking of when you asked us to address this Quinteros question, but I would, if it was, I would very much like to address that. This court's discussion in Quinteros, where you talked, you used that language about, or the court used the language about, it's the results that matter, not the effort. That was in a very specific context of a case in which there was direct evidence that government officials were likely to be involved in future harm. And in that context, which was the case in Quinteros and some other Third Circuit decisions, yes, it is absolutely correct that the government, if there's a government official involved, then the question then is, is the government gonna stop that from happening? And yes, that's correct. And I think this court had been responding in Quinteros in several cases to the suggestion that once, if there's a government official involved, that could be sort of negated by the government being opposed to what the official was doing. And that is a question that the attorney general actually addressed over the summer and took basically the same position the court has been taking and saying that the official action only has to be satisfied once. So if there is an official that's involved, it doesn't take that away, the fact that it's contrary to the government's official position. And that is in the OFAS case that I cited in my 28J letter. So the attorney general has told the agency as recently as July said, let's not talk about rogue officials anymore. The question is, is any official going to acquiesce in this conduct? But that's not the case here. Here, we're talking about private actors with no evidence of official involvement or even awareness. And when you're talking about a purely private harm, then it is not the case that only results count, that you need to look at the regulation then. And the regulation for acquiescence in the CIT context is specifically, it's a two-step test. It requires prior awareness, but then it has an actus reus type requirement. It says it requires breach of a legal duty to intervene to prevent the harm. So in the context where there's no other state action, acquiescence requires breach of a legal duty to intervene. So it is all about efforts. So while what the court said in Quinteros was fine in that context of official action, it would be very, very much a mistake to transplant that to a situation that is purely private harm. And it would be contrary to all the other circuit courts of appeals that have considered that question. So- Counsel may not be exclusively results, but are you taking the position that Quinteros has the IJ looking to that only, to the issue of success in the government's efforts to stop that particular type of conduct, only where there is involvement of a government agent, or where there's not, that both efforts and success under Quinteros can be considered? Well, certainly that can be considered, but success cannot be required. I mean, I think that's clear under the regulation. And Your Honor, the regulation follows directly from the Senate's understanding and the ratification history of the CAT. And it's important to recognize that acquiescence was a big issue in ratification for the reason that, you know, CAT is not just about non-refoulement. CAT is a broader treaty that involves an obligation of all the signatories to make torture a criminal offense in their country, and also gives a basis for international jurisdiction so that our officers could be prosecuted internationally for torture. And for that reason, the government was very careful to, they were concerned that if acquiescence was not limited, that our people could be prosecuted in a situation that would not satisfy due process. And that's why they put in that very rigorous acquiescence standard that requires prior awareness, plus breach of a legal duty to intervene. So the focus is on their intervention because in a criminal context, you're not going to be prosecuted, or it wouldn't satisfy due process to prosecute somebody for failing to succeed at something they couldn't succeed at. I mean, the question for criminal purposes is if they failed to try to do something they were obliged, legally obliged to do. Does that answer the question? Yes, thank you. While we've exceeded time, I'd like you to, I just briefly address the issue of relocation because as we have heard from Ms. Cambria, there is in the regulation section 208.13B1 and B3 that identify both reasonableness and efficacy as required in making the determination of ability to relocate and identify particular factors that the IJ should consider. Where we, do you see in the record here any indication that the IJ did consider those and in the absence of that, do we have occasion to remand given in particular the burden shifting issue that I referenced earlier? Your Honor, I think I started to talk about that earlier. The immigration judge did not make a relocation finding in the withholding context and I think you're citing the withholding regulation and Mr. Cantareras did not raise that as an error in the withholding decision. So he did not exhaust that in the agency and he did not raise that in his brief either to this court. So if the immigration judge had made a relocation finding in the context of withholding, then there might be something to talk about but she didn't do that and he didn't argue that she did. I mean, it wouldn't have been a good argument. But so that relocation in the withholding context is simply not before the court. Does that answer your question? Yes, I understand the argument but what about the IJ's opinion at appendix 55 to 56 indicates to you that his determination as to relocation was limited to the Kat claim? Well, it's in the Kat discussion and it's definitely it's citing to the CAT regulation. That CAT regulation requires the immigration court to look at four factors, one of which is relocation. It does not have all the reasonableness inquiry and all that that's in the withholding regulation. And it also does not have burden shifting. So and that's something that I think, I mean, the CAT simply did not, they did not decide to go with the burden shifting framework. It's not inevitable that a court would proceed that way. And so in CAT, you don't. I mean, that's something we've litigated in other circuits and it's been recognized that there is not burden shifting in the CAT. Okay, if the court has no further questions, I'll ask you to deny the petition. Thank you. Ms. Cabrera, your rebuttal time. Thank you, Judge Krause. And I won't take up too much time. I just want to hit some certain points. I appreciate that the government is not defending Nexus in this case.  and even the judge's decision herself indicate that at least the court one central reason for the harm that the petitioner suffered was his sexual orientation or the fact that he had voted. And we would attribute that to a political opinion. Something that's really important with that is that once you have been persecuted in the past on account of a protected ground, should the unwilling or unable question also be answered, the petitioner has a presumption of future harm. And the immigration judge in this instance never actually considered any future harm. The petitioner might suffer on account of his sexual orientation or his political opinion. I believe that the rationale is limited to one or two sentences. And in that instance, the government also has not rebut that presumption in any way. Did your client list the case that he was unable to relocate regardless of whether he was entitled to the presumption or not? And where in the record was any argument as to relocation in connection with the withholding claim raised? With regard to the withholding claim, and the government is right that the relocation language is simply stated in one argument that the immigration judge makes in her opinion. However, in his testimony, he did provide testimony, as I had mentioned, when Judge Bibas brought it up on the original opening, was that he indicated that when he went to San Pedro Sula, which by the way, was solely for a couple of months out of his entire 20 years of living, he experienced discrimination. He experienced humiliation. He experienced, although being able to participate in a political march, he was aware of harms that happened to people. He understood that there were two gangs in the area that restricted his ability to live safely. He testified that he did not feel safe there. So based on his testimony, he did combat the relocation argument. Additionally, there's country condition evidence within the record that indicates certain violence against people like the petitioner happens not only in the area where he lived, but actually happens nationwide. And it's really important to understand that the relocation language with regard to withholding is reasonableness. It's not that he does not have to show that it's more likely than not. He just has to show that it's reasonable. As far as CAT goes, he has to establish that he could not live safely in another place. And although Judge Bibas had alluded to the fact that he lived in San Pedro Sula for a portion of time, we would say that a few months out of one's life is not sufficient to show that he would live safely on balance with his testimony, on balance with the country condition evidence, on balance with the fact that in his life, he had experienced at least three sexual assaults. He had experienced humiliation. He had experienced intimidation by police and authorities. He had reported a rape to the police who told him it was too late. So dismissed him. That would have a silencing effect on any young person trying to report a violent crime. All of these things must be taken into account as to whether it's reasonable for him to relocate. And that's for withholding and whether it's reasonable and could he safely live somewhere else, which is what we would look at for the CAT analysis. And I guess- I think we've exceeded time. Unless my colleagues have other questions, we'll give you a brief moment to wrap up. My only last point is with regard to the AB standard. I agree with you, Judge Krause, that if it is remanded for other issues, I think courts below would benefit from an instruction as to what the standard is. I believe that immigration judges are experiencing much confusion from the AB decision. And we would recommend that courts be instructed to follow the precedent and to understand what the standards are so we don't end up on appeal for certain issues. That's all. Thank you very much, Your Honor. We thank you, Ms. Cambria and Ms. Green for an excellent briefing and argument today. And we will take this case under advisement and our court day is now adjourned.